# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 22, 2003

## STATE OF TENNESSEE v. MARCUS THOMPSON

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S41,514    Phyllis H. Miller, Judge**

---

**No. E2001-02521-CCA-R3-CD**
**August 22, 2003**

---

The appellant, Marcus Thompson, was convicted in the Sullivan County Criminal Court of one count of conspiracy to sell or deliver cocaine, one count of possession of cocaine with the intent to sell or deliver, and one count of selling and delivering cocaine. The trial court imposed a total effective sentence of forty years incarceration in the Tennessee Department of Correction and fines totaling $150,000. On appeal, the appellant raises several issues for our review, including speedy trial, sufficiency of the evidence, double jeopardy, evidentiary rulings, and sentencing. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court but reduce the amount of the appellant's fines to a total amount of $50,000.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed as Modified.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); William A. Kennedy, Blountville, Tennessee (on appeal); and James Bowman, Johnson City, Tennessee (at trial), for the appellant, Marcus Thompson.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Robert Montgomery, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On September 8, 1998, the Sullivan County Grand Jury returned a multi-count presentment against the appellant charging him in count one with conspiring between March 30,

1998, to April 30, 1998, to sell or deliver more than 300 grams of cocaine;[1] count two with the possession of 300 grams or more of cocaine on or about April 30, 1998, with the intent to sell or deliver; count three with selling or delivering .5 grams or more of a substance containing cocaine on or about April 30, 1998; count four with possessing drug paraphernalia on or about April 30, 1998; and count five with possessing over one-half ounce of marijuana on or about April 30, 1998. On December 15, 1998, the appellant was indicted in federal court for conspiracy to distribute and possess cocaine "beginning approximately the month of September, 1996, and continuing to on or about May 1, 1998." On January 1, 1999, the appellant was released into federal custody and the original trial date of February 24, 1999, was reset.

After pleading guilty to the federal charge, the appellant was returned to state custody on April 10, 2000. On July 21, 2000, the appellant filed a motion for speedy trial and the dismissal of his charges on double jeopardy grounds because of the federal charges. After a hearing on the motion on July 28, 2000, the trial court determined that the appellant was not entitled to a dismissal of his charges on double jeopardy grounds and further determined that the appellant had demonstrated "no actual prejudice" because of the delay.

Trial commenced on May 21, 2001. The State called Larry Robbins as its first witness. Robbins testified that in April 1998, he worked for the Johnson City Police Bureau and was assigned to work as an agent for the 1st Judicial District Drug Task Force (1st DTF). Robbins explained that "[t]he First District is made up of our (4) four counties, Washington, Carter, Unicoi and Johnson, and each department is encouraged to send an employee from their department to the Drug Task Force to work as one entity to work the drugs in that four county area." Robbins related that often the cases crossed the county lines into another jurisdiction and thereupon the 1st DTF would contact the drug task force from the other jurisdiction and the two forces would work together.

The 1st DTF arranged a controlled buy of one ounce of crack cocaine from Sanford Whetsel, also known as Turk Whetsel, on April 29, 1998. Upon his arrest and in exchange for a possible "recommendation from the D.A.," Whetsel agreed to arrange for his supplier, Melisa Long, to bring him more crack cocaine. At that time, Long resided in Kingsport, outside the jurisdiction of the 1st DTF. Accordingly, Whetsel arranged for Long to bring two ounces of crack cocaine to a McDonald's Restaurant in Gray, a locale in Washington County, which was within the jurisdiction of the 1st DTF. The agreed purchase price was $1,600 or $1,800 an ounce. Robbins further noted that "[s]omeone who's buying an ounce at a time is someone that's going to be reselling it."

Later on April 29, 1998, Long brought the crack cocaine to the prearranged location and she was arrested. Robbins talked with Long about cooperating with the 1st DTF to "help herself out and hopefully get a recommendation towards the D.A. about her involvement." Long revealed that her supplier, the appellant, was located in Sullivan County, within the jurisdiction of the 2nd

---

[1] The names of the appellant's co-conspirators are marked out on the presentment included in the record. However, the jury instructions reveal that the appellant was charged with conspiring with Jenice Thompson and Daryl R. Williams, a.k.a. Daryl R. Lathen.

Judicial District Drug Task Force (2nd DTF). Robbins contacted Brian Bishop, the Director of the 2nd DTF and asked for cooperation in apprehending Long's supplier. Director Bishop agreed to help.

Later that evening, Long, acting per her agreement with the 1st DTF, made a telephone call to a certain number to arrange a drug transaction with the appellant. Robbins saw the number that Long dialed, but he was unable to overhear the conversation. Thereafter, agents with the 1st DTF drove Long to Sullivan County. Prior to the arranged buy, Long's person and possessions were searched and no contraband was found. The rest of the arranged buy was conducted through members of the 2nd DTF.

Robbins related that Long was charged with a crime in the Washington County Criminal Court and that those charges were still pending at the time of trial. Robbins opined that Long hoped her case would be dismissed in return for her cooperation with the authorities.

Melisa Long testified that she was arrested by Robbins on April 29, 1998, at a McDonald's Restaurant in Gray. Robbins asked Long to tell him where she obtained the crack cocaine. Long revealed that the appellant was her supplier. After agreeing to help the 1st DTF apprehend the appellant, Long called the appellant from a pay phone outside the McDonald's Restaurant. Long told the appellant that "I needed more of what I had before," indicating that she needed two more ounces of crack cocaine. Long asserted that the price of the crack cocaine was over $1,000 an ounce, but that she already knew the price before she called. The appellant directed Long to go to the house of his cousin, Jenice Thompson, to obtain the drugs. Specifically, Long testified that "[the appellant] told me to go. I mean, he told me to go there. I been there before. And he told me to go."

Long further stated that within thirty days prior to April 29, 1998, she had been to Thompson's residence to obtain cocaine at the appellant's direction. The appellant objected to this testimony, but the objection was overruled. Long asserted that on the previous occasion, she went to Thompson's apartment in the Amber Court Apartments on Moreland Drive. Thompson's boyfriend, Daryl Williams, also known as Daryl Lathen, was also at the apartment. Long did not give Thompson or Williams any money; however, she obtained cocaine from one of them. Long could not specifically recall whether Thompson or Williams gave her the cocaine. Long did not have to ask for the cocaine because "[t]hey knew what I was coming for."

In the early morning hours of April 30, 1998, Director Bishop with the 2nd DTF drove Long to Thompson's apartment. While Director Bishop waited in the vehicle, Long went inside Thompson's apartment. Once again, both Thompson and Williams were in the apartment. "They" gave Long the crack cocaine. Long explained that she did not remember which person gave her the crack cocaine, but did recall that it was either Thompson or Williams. Long also stated that she did not have to tell Thompson or Williams why she was there. Long apologized for being late and placed the crack cocaine in her purse. She did not give Thompson or Williams any money at that time. Long then left the apartment and got into the car with Director Bishop to whom she relinquished possession of the crack cocaine.

Later in the afternoon of April 30, 1998, Long called the appellant and arranged to meet him in the parking lot of a Revco drugstore on Stone Drive in order to pay him for the crack cocaine. Long was to pay the appellant $3,600 which she obtained from DTF agents.

Soon after the telephone call, the appellant arrived at the Revco parking lot. Long sat in the front passenger seat of the appellant's vehicle. Long told the appellant that she had the money and the appellant instructed Long to put the money in the glove compartment of his vehicle. Long removed the money from her purse and placed $3,300 in the appellant's glove compartment. Long explained that she kept $300 of the money because

> I guess it was my – for making like going down there and making a run or whatever, I guess that's what I was supposed to get paid out of it.
>
> . . . .
>
> I think we, maybe it was supposed to have been maybe a hundred an ounce or something like that, so it come up to be three ounces, so three hundred dollars ($300.00).[2]

After Long placed the money in the glove compartment, she and the appellant talked for a short time. Shortly thereafter, they were approached by the authorities and were arrested.

Long testified that she had known the appellant for approximately ten years and they had attended high school together. Long admitted that she had been the appellant's girlfriend in high school, but after Long became pregnant, the appellant ended the relationship. Approximately ten years after the end of their relationship, Long encountered the appellant in a club and renewed their acquaintance. Soon thereafter, Long contacted the appellant about purchasing crack cocaine for her sister who was an addict. She explained that "I'm not ready to go out in the street and buy no drugs." Long asserted that she did not use drugs at the time of the offenses.

Long testified that she had never been charged with a crime in Sullivan County but still had charges in Washington County which had been pending for approximately three years. Nevertheless, Long hoped to have the charges dismissed. Long admitted that she never took drugs directly from the appellant's hands, "but he would tell me where to get it."

Regarding the ounce of crack cocaine she sold to Whetsel, Long related that initially she did not have to pay for those drugs. Instead, the drugs were "fronted" to Long because she already had a buyer for the crack cocaine. After receiving the money from the buyer, Long was to return with the money and pay for the cocaine. Long explained that even though she had obtained crack cocaine from Thompson and Williams on previous occasions, "they're not going to front anything to me if he [the appellant] didn't tell them to."

---

[2] Long was being paid by the appellant for the ounce she supposedly sold Whetsel and for the two ounces she purchased for the DTF.

Long stated that in the thirty days prior to April 29, 1998, she had obtained drugs through the appellant on three occasions. She opined that "the first one, I probably was at the bridge. The second two maybe had been at the house [of Thompson]. That was three years ago. I don't really remember that far back." Long related that the bridge was at "John B. Dennis and Moreland Drive." She stated that Thompson's apartment was also on Moreland Drive. Furthermore, Long testified that prior to obtaining drugs from underneath the bridge, she spoke with the appellant. The appellant instructed Long to go to that particular location to obtain the crack cocaine.

Brian Bishop, the director of the 2nd DTF, testified that at approximately midnight on April 29, 1998, he was contacted by the 1st DTF and was advised "that a pick up of cocaine had been arranged." Subsequently, agents with the 1st DTF brought Long to Sullivan County to meet with Director Bishop. Director Bishop searched Long's person and belongings prior their departure for Thompson's apartment. Long had no contraband or money on her person or in her purse. Director Bishop then drove Long to Thompson's apartment on Moreland Drive at approximately 1:00 a.m. on April 30, 1998. Director Bishop waited in the vehicle while Long went into the apartment. Long returned to the vehicle with what appeared to be two ounces of crack cocaine. Director Bishop testified that such an amount of crack cocaine was far too large for personal use.

Director Bishop next had contact with Long on the afternoon of April 30, 1998. Long had arranged to meet the appellant in the Revco parking lot to pay for the drugs. Long was wired with a body transmitter and the agents monitored the transaction with a receiver. Long was given $3,600 prior to meeting with the appellant to pay for the crack cocaine. When the agents heard a pre-arranged signal, they moved in and took the appellant into custody. During a search of the vehicle, the agents discovered the money in the glove compartment of the appellant's vehicle.

Based upon these events, the authorities obtained a search warrant for Thompson's apartment. Director Bishop and officers with the 1st DTF, the Kingsport Police Department, and the Sullivan County Police Department were involved in the execution of the search warrant on April 30, 1998, at 9:00 p.m.

Director Bishop stated that Thompson had a two-bedroom apartment. One of the bedrooms appeared to be a child's room. On the top shelf of the closet in the child's room, officers discovered a cardboard box containing a plastic shopping bag. Inside the shopping bag were several large bags of white powder, two smaller bags of white powder, and two bags of a green leafy substance believed to be marijuana. Director Bishop opined that the white powder was cocaine and he estimated that the bags contained half a kilogram, or 500 grams, of cocaine. On the top shelf of the second bedroom, the officers discovered a small bag containing several plastic sandwich bag "corners" of white powder substance, also believed to be cocaine, which was packaged for resale. The officers also discovered a set of digital scales which Director Bishop explained could be used in the weighing of controlled substances. Additionally, officers discovered more plastic sandwich bags of the type used to package cocaine for resale.

Director Bishop stated that no money was found in Thompson's apartment. Moreover, there were no expensive-looking items in the apartment. Director Bishop concluded that the marijuana discovered was packaged as if for resale and had a street value of $225 or $250. Director Bishop also explained that crack cocaine was typically smoked, but the officers found no device in the apartment for the smoking of crack cocaine. Furthermore, Director Bishop stated that powder cocaine could either be snorted or injected, but no implements for either type of use were discovered in Thompson's apartment. Director Bishop admitted that although various items were checked for fingerprints, "there were no prints developed that were identified [as the appellant's]." However, there were also no fingerprints which were "identified" as belonging to Thompson or Williams even though they both resided in the apartment.

Agent Denise Buckner with the Tennessee Bureau of Investigation (TBI) crime laboratory in Knoxville testified that she analyzed a portion of the substances obtained by the police during these events. Both the State and the appellant stipulated that Agent Buckner was an expert in drug chemistry. Agent Buckner testified that she analyzed two bags of a substance and determined that it was 53.11 grams of cocaine base, which is also known as crack cocaine.

Next, the State and the appellant stipulated that Agent David Holloway, a forensic chemist with the TBI crime laboratory, was an expert in forensic chemistry. Agent Holloway testified that he analyzed a total of 467.8 grams, or 1.03 pounds, of powder cocaine which was obtained from Thompson's apartment. Agent Holloway also asserted that the green leafy substance weighed 32.46 grams and tested positive for marijuana.

Robbins was recalled to the stand and he testified that Long dialed the same telephone number to obtain the drugs as she had dialed to arrange payment for the drugs. Soon after the second telephone call, the appellant arrived at the Revco parking lot.

Based upon the foregoing, the trial court granted a judgment of acquittal on count five of the presentment, determining that no proof was adduced that the appellant was involved in the possession of marijuana as alleged in that count. The jury found the appellant not guilty of the possession of drug paraphernalia, but returned guilty verdicts on the conspiracy, possession, and sale counts.

Subsequent to a sentencing hearing, the trial court sentenced the appellant as a Range II multiple offender to twenty years incarceration for each offense. The trial court further determined that the appellant committed the offenses while on parole for a previous offense and ordered that the sentences for the instant convictions be served consecutively to the earlier sentence. Additionally, the trial court found that the appellant was a professional criminal and had an extensive record of criminal activity, and thus it ordered that the sentence for count three be served consecutively to count one. The sentence for count two was to be served concurrently with count one for a total effective sentence of forty years incarceration.

On appeal, the appellant raises the following issues for our review: (1) whether the evidence is sufficient to support the appellant's convictions; (2) whether the appellant was denied his constitutional right to a speedy trial; (3) whether the appellant was subjected to double jeopardy because his state and federal convictions were based upon the same underlying criminal activity; (4) whether the appellant was subjected to double jeopardy based upon his convictions for conspiracy to sell cocaine and the sale of cocaine and possession with the intent to sell cocaine; (5) whether the trial court erred in admitting Long's testimony regarding the previous sales of cocaine at Thompson's apartment; (6) whether the appellant's due process rights were violated by the State withholding exculpatory evidence; and (7) whether the sentences imposed were excessive.[3]

## II. Analysis
### A. Speedy Trial

We note that "[t]he right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, [section] 9 of the Constitution of Tennessee." State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973). In analyzing the speedy trial issue, four factors are important: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant from the delay." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)).

"The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). A delay of one year or longer will trigger an inquiry into a speedy trial violation. See State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001). In the instant case, the appellant was arrested on April 30, 1998, and trial began on May 21, 2001, a delay of well over one year. Thus, we must examine the remaining factors to determine whether there has been a speedy trial violation.

The second factor, the reason for delay, generally falls into one of four categories: "(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996) (footnotes omitted). In this case, the appellant was taken into federal custody on January 30, 1999, and he remained in federal custody for approximately one year. The appellant testified that during this time, he and defense counsel "were, I guess negotiating a defense and trying to, I don't know, weigh my options and see which avenue we could take and see which would have been better for me as his client." A large portion of the delay in the State's case was attributed to waiting for the conclusion of the appellant's federal prosecution before commencing his state prosecution. On April 14, 2000, the appellant pled guilty in federal court to "[c]onspiracy to distribute and possess with the intent to distribute cocaine hydrochloride and cocaine base 'crack.'"

---

[3] We have chosen to address the appellant's issues in a different order than that in which they were raised in the appellant's brief.

However, the appellant and the State agree that the record does not reveal the reason for the delay between the hearing on the appellant's motion for a speedy trial, which occurred on July 28, 2000, and the date of trial, May 21, 2001. We determine that "[t]he State's inability to offer any reason for the [further] delay in bringing the defendant to trial is evidence of [negligence or] bureaucratic indifference." State v. Willie Johnson, No. W2001-02929-CCA-R3-CD, 2003 WL 141045, at *11 (Tenn. Crim. App. at Jackson, Jan. 14, 2003), perm. to appeal denied, (Tenn. 2003). After examination of the record, we conclude that this factor weighs against the State, but it is entitled to little weight.

In addressing the third factor in our analysis, we note again that the appellant moved for a speedy trial in July 2000, three years after the commencement of proceedings. Less than one year after asserting this right, the appellant was brought to trial. This factor weighs in favor of the appellant. See Vickers, 985 S.W.2d at 6. However, the appellant's lengthy delay in asserting his right to a speedy trial makes this factor less persuasive. See State v. Charles B. Jackson, Jr., No. 89-16-III, 1989 WL 155948, at *2 (Tenn. Crim. App. at Nashville, Dec. 29, 1989). We also note that on the day of trial the appellant asked for a thirty day continuance to "re-go over" the case with counsel, indicating a lack of interest in bringing his case to trial in a timely fashion.

Finally, we must determine whether the appellant was prejudiced by the delay. Wood, 924 S.W.2d at 348. This is the "final and most important factor in the [speedy trial] analysis." Simmons, 54 S.W.3d at 760. Our supreme court has explained that "when evaluating this factor courts must be aware that the speedy trial right is designed: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize anxiety and concern accompanying public accusation; and (3) to limit the possibilities that long delay will impair the defense." Id.

Based upon the record before us, we cannot conclude that the appellant suffered any prejudice by the delay in prosecution. The appellant does not claim that the delay in bringing his case to trial impaired his ability to present a defense, "the most important issue concerning prejudice to the defendant." State v. Vance, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994). The appellant was incarcerated prior to trial, but the incarceration was due to a parole violation, not the instant charges. The appellant does not argue that he was subjected to "undue and oppressive incarceration prior to trial." Instead, the appellant contends that

> [i]t is obvious from appellant's testimony during the motion hearing that he experienced anxiety and concern regarding the State charges as would relate to possible sentencing. Appellant testified that federal authorities advised him that if he was sentenced upon the State charges, his federal sentence would run concurrent to the state sentence. Facing the possibility of consecutive sentencing while remaining in federal custody upon the inaction of the State would undoubtedly cause concern and anxiety. Of course, in the end appellant's state sentence was run concurrent to the federal sentence, but appellant had no way of knowing this would be the end result.

-8-

As the appellant acknowledges, the sentence in the instant case was ordered to be served concurrently with his federal case. At the hearing on the appellant's speedy trial motion, the trial court noted that

> I don't find that the [appellant] has demonstrated any actual prejudice. . . . I mean there's no evidence that he would have been given concurrent time by the federal court system, by the federal prison system if that's only a recommendation by the judge, and it's up to the prison system. . . . [I]t seemed to be an acknowledgment on both parties part when it was, when the case was reset so many times, and of course there was no statement that he's losing any opportunity to ask for anything.

See Simmons, 54 S.W.3d at 761 (observing that "a lost possibility of obtaining concurrent sentencing is not sufficient prejudice to establish a speedy trial violation"). We agree with the trial court and conclude that appellant is not entitled to relief on this issue.

## B. Long's Testimony

The appellant complains that the trial court erred by allowing Long's testimony regarding prior cocaine deals with the appellant. The appellant contends that these deals constituted other bad acts and he was thereby entitled to the protections of Tennessee Rule of Evidence 404(b). The appellant admits that the trial court held a hearing in compliance with Rule 404(b), but argues that the trial court reached the wrong result.

Initially, we note that the appellant concedes that he failed to raise this issue in his motion for new trial, thus waiving the issue on appeal. See Tenn. R. App. P. 3(e). Nevertheless, the appellant contends that this court may address this issue as plain error. Tennessee Rule of Criminal Procedure 52(b) explains that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." See also Tenn. R. Evid. 103(d); State v. Adkisson, 899 S.W.2d 626, 640 (Tenn. Crim. App. 1994). Regardless, the appellant has failed to convince this court that the trial court committed error in admitting Long's testimony.

Evidence that a defendant has committed crimes, wrongs, or acts other than those crimes for which he is being tried is not admissible to prove his character and thereby show action in conformity with the character trait. See Tenn. R. Evid. 404(b); State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997). Nevertheless, such evidence is admissible under Rule 404(b) if it is relevant to a material issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect. Hall, 958 S.W.2d at 707.

In order to permit the admission of the evidence, the court must find by clear and convincing evidence that the appellant committed the prior crime. See State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867

S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing.

We note that the presentment charging the appellant with conspiracy to sell or deliver cocaine alleged that the conspiracy occurred between March 30, 1998, and April 30, 1998. Thus, Long's testimony regarding any cocaine deals with the appellant during this time period do not constitute "other" acts of the appellant. Instead, such proof is necessary to establish that a conspiracy occurred during the time frame alleged in the presentment. As such, the trial court was not required to perform a Rule 404(b) analysis as to the admission of this testimony regarding the conspiracy count.

However, Long's testimony regarding prior cocaine deals with the appellant does constitute other acts evidence as to the appellant's possession charge in count two and the sale and delivery charge in count three. As we stated earlier, the trial court held a jury-out hearing on the Rule 404(b) issue. At the conclusion of the hearing, the trial court found that the State had established by clear and convincing evidence that these other acts occurred. The court further determined that the proffered testimony related to the appellant's intent; i.e. his knowing possession of the cocaine located in Thompson's apartment. Finally, the trial court determined that the probative value of Long's testimony was not outweighed by any danger of unfair prejudice. Furthermore, after Long's testimony, the trial court gave the jury a limiting instruction restricting the jury's consideration of Long's testimony as to the appellant's intent in counts two and three, specifically instructing the jury to not consider the testimony "as to whether or not there's any propensity by the defendant to commit the crime." See State v. Little, 854 S.W.2d 643, 649 (Tenn. Crim. App. 1992).

We agree with the trial court that the evidence of the previous cocaine transactions between Long and the appellant were probative to the issue of the appellant's intent to sell or deliver the cocaine and to possess the cocaine with the intent to sell or deliver. See id.; State v. Bernard Jerome Jones, No. M2000-00018-CCA-R3-CD, 2000 WL 1562864, at *3 (Tenn. Crim. App. at Nashville, Oct. 20, 2000); State v. Johnny Wayne Tillery, No. 01C01-9506-CC-00182, 1998 WL 148326, at *1 (Tenn. Crim. App. at Nashville, Mar. 30, 1998). A leading treatise on Tennessee evidence has explained:

> Intent is ordinarily inferred from evidence of the defendant's overall plan to commit such crimes or from proof of defendant's motive. A related inference is the inference that a person intended a certain result if he or she had previously acted in the same way and achieved the same result. This inference is stronger if the previous acts and results closely resemble those alleged in the instant case.

Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[10], at 4-86 (LEXIS publishing, 4th ed. 2000) (footnotes omitted). Additionally, we observe that Long's testimony regarding the previous transactions with the appellant establishes the appellant's opportunity to commit the aforementioned

crimes.  See State v. Paul  J. Ward, No. E2001-00175-CCA-R3-CD, 2002 WL 65999, at *4 (Tenn. Crim. App. at Knoxville, Jan. 18, 2002), perm. to appeal denied, (Tenn. 2002); see also Cohen, Tennessee Law of Evidence, § 4.04[14], at 4-95.  We conclude that the trial court did not abuse its discretion in admitting Long's testimony regarding prior cocaine transactions involving the appellant.

## C.  Exculpatory Evidence

The appellant argues that "the State entered into an express or implied agreement with . . . Long regarding any criminal prosecution against her in exchange for her testimony against the appellant."  As proof of the agreement, the appellant contends that "[i]t is incredible that the pending felony drug charge [against Long] would remain pending and in limbo for three (3) years without some agreement between the State and Long regarding her favorable testimony against the appellant."  The appellant admits that this issue is raised for the first time on appeal, but claims that this court should not deem the issue waived and instead we should address this issue as plain error.

Upon our review of the record, we conclude that the appellant has waived this issue by failing to raise it in the trial court.  See Tenn. R. App. P. 3(e).  Moreover, we observe that the record does not establish the existence of an agreement between the State and Long.  See State v. Brian S. Roberson, No. 01C01-9708-CC-00334, 1999 WL 77845, at *2 (Tenn. Crim. App. at Nashville, Feb. 19, 1999).  Accordingly, we will not review the appellant's claim as plain error.  See Tenn. R. Crim. P. 52(b); Tenn. R. Evid. 103(d).

## D.  Double Jeopardy

The appellant has raised two issues regarding double jeopardy.  Both the federal and state constitutions contain double jeopardy clauses which protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense.  See U.S. Const. Amend. V; Tenn. Const. Art. I, § 10; State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996).  Both of the appellant's claims relate to the third category, multiple punishments.

### 1.  Federal

The appellant argues that he "was twice put in jeopardy for the same criminal conduct arising from his convictions in both the United States District Court and the Sullivan County Criminal Court."  It is unclear from the appellant's argument whether his double jeopardy concerns involve his state convictions for conspiracy, possession, or sale and delivery, or a combination of these convictions.  Nevertheless, this issue is without merit.

Both federal and Tennessee courts have found that the dual sovereignty doctrine permits convictions in state and federal courts arising from the same criminal conduct without violating double jeopardy.  See generally Bartkus v. Illinois, 359 U.S. 121, 79 S. Ct. 676 (1959); Lavon v. State, 586 S.W.2d 112, 113-14 (Tenn. 1979).  The dual sovereignty doctrine is based upon the rationale that "the state and federal governments are distinct sovereignties, and thus the punishment of a single act by each is not double jeopardy."  Lavon, 586 S.W.2d at 113-14.  The

appellant concedes that Tennessee courts currently honor the dual sovereignty doctrine, but asks this court to now abandon this doctrine.

This court recently faced a similar dilemma in State v. Carpenter, 69 S.W.3d 568 (Tenn. Crim. App. 2001), cert. denied, 535 U.S. 995, 122 S. Ct. 1557 (2002). After recognizing that the dual sovereignty doctrine has been criticized, this court observed that our cases have nevertheless consistently upheld the dual sovereignty doctrine. Id. at 577-78. We noted that "'established precedent, frequently reaffirmed by this court, and long accepted by the legislature, should not be departed from lightly.'" Id. at 578 (quoting Lavon, 586 S.W.2d at 114). Accordingly, this court declined to reverse Carpenter's convictions on double jeopardy grounds. Id. Likewise, we conclude that the appellant is entitled to no relief on this issue.

2. State

The appellant also complains that his "convictions for conspiracy to sell cocaine and the sale and possession with the intent to sell cocaine violated the double jeopardy provisions of the Fifth Amendment to the United States Constitution and Article I, § 10 of the Tennessee Constitution, as well as the due process guarantees of Article I, § 8 of the Tennessee Constitution." The appellant recognizes that this court has held that "convictions for both the sale of cocaine and the conspiracy to sell cocaine do not violate double jeopardy." State v. Thornton, 10 S.W.3d 229, 240 (Tenn. Crim. App. 1999). Regardless, the appellant asks this court to reverse the appellant's convictions. The appellant fails to specify which convictions he believes should be reversed.

In Tennessee, whether two offenses are the "same" for double jeopardy purposes depends upon a close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances. See State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). This analysis is guided in part by the application of the test announced in Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932), namely "'[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.'" Black, 524 S.W.2d at 919 (quoting Blockburger, 284 U.S. at 304, 52 S. Ct. at 182). However, the Blockburger analysis is not decisive of the issue. "Courts should also consider whether the same evidence is used to prove both offenses." Thornton, 10 S.W.3d at 239. Our supreme court explained the same evidence test by stating, "'One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by the statutes.'" Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973) (quoting 21 Am. Jur. 2d Criminal Law § 82); see also Denton, 938 S.W.2d at 380.

Accordingly, we must utilize a four-part test in order to determine if double jeopardy attaches:

> (1) a Blockburger analysis of the statutory offenses;
> (2) an analysis, guided by the principles of Duchac, of the evidence

used to prove the offenses;
(3) a consideration of whether there were multiple victims or discrete acts; and
(4) a comparison of the purposes of the respective statutes.

Denton, 938 S.W.2d at 381.

As we noted earlier, this court applied such an analysis in Thornton, ultimately determining that "[b]ecause different elements are required under each statute, the same evidence was not used to prove both offenses, and the statutes have different legislative purposes, the convictions for both the sale of cocaine and the conspiracy to sell cocaine do not violate double jeopardy." 10 S.W.3d at 240. Likewise, we conclude that the offenses as charged in the instant case require different elements. For example, as this court has observed, "[a]n agreement is not an essential element of the offense of selling or delivering drugs. Similarly, the actual sale or delivery of drugs is not an element of the conspiracy offense." Id. at 239. Furthermore, an agreement is not an essential element of the possession of drugs with the intent to sell or deliver, nor is possession an element of the offense of conspiracy.

Turning to the same evidence test, we conclude that the appellant's three convictions were based upon different evidence. The appellant's conspiracy conviction was based upon the agreement between himself, Thompson, and Williams to sell or deliver the cocaine. The appellant's possession conviction was based upon his possession with the intent to sell or deliver the cocaine that was discovered in Thompson's apartment. Finally, the appellant's conviction for selling or delivering cocaine stemmed from the transaction with Long involving two ounces of cocaine.

Moreover, "the statutes involved do not have similar legislative purposes." Thornton, 10 S.W.3d at 239. That is to say, the conspiracy statute was designed to deter agreements that would violate Tennessee laws. Id. Accordingly, the statute prohibits group criminality. Id. at 240. Notably, the drug statutes prohibit the sale or delivery of controlled substances, or possession of controlled substances with the intent to sell or deliver, without consideration of group criminality. Id. Moreover, the appellant was charged with possessing the cocaine in Thompson's apartment with the intent to sell and was charged with selling two ounces of cocaine to Long. In sum, the appellant was not charged with selling and possessing with the intent to sell the *same* controlled substance. Accordingly, the appellant's three convictions do not violate double jeopardy.

In a related issue, the appellant contends that due process prohibits his convictions for all three offenses because "in this case proof of the conspiracy was 'essentially incidental' to the underlying felonies of possession and [sale] of cocaine." The appellant cited State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), in support of this proposition. Regrettably, the State did not address this issue in its brief.

This court has explained that "[i]n Anthony, our supreme court was concerned about the fact that proving one felony, the armed robbery, inherently and necessarily proved the elements of the second felony, kidnaping." Thornton, 10 S.W.3d at 240. However, we further stated that "the

-13-

proof of the elements of sale of cocaine does not inherently or necessarily prove the elements of conspiracy." Id. Specifically, this court has stated that

> [t]here will always be a nexus between the conspiracy and the substantive offense when the latter offense is completed. A conspiracy, however, would rarely be "essentially incidental" to the underlying offense, as that term is used in Anthony. . . . Moreover, the statute prohibiting conspiracies is designed to combat a danger posed to the public that is different from the danger sought to be prevented by the drug statutes. The plan and design of two or more individuals to sell cocaine creates an offense that is worthy of its own punishment.

Id. at 240-41.

In the instant case, the facts underlying the appellant's convictions are not "inherently interwoven" so as to make each offense "essentially incidental" to the other offenses. The appellant was capable of possessing the cocaine with the intent to sell or deliver without engaging in a conspiracy with Thompson and Williams. Additionally, the appellant was capable of selling and delivering two ounces of cocaine to Long without entering into a conspiracy or possessing between twenty-six grams and 300 grams of cocaine. Moreover, based upon any agreement between Thompson and Williams, the appellant could have entered into a conspiracy without possessing the cocaine with the intent to sell or deliver. See Thompson, 10 S.W.3d at 240. Accordingly, we conclude that the appellant's three convictions do not violate due process.

### E. Sufficiency of the Evidence

The appellant next contends that the evidence is insufficient to sustain his convictions. In assessing a challenge to the sufficiency of evidence, this court is guided by several well-established principles. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted on count one of conspiring with Thompson and Williams between March 30, 1998, and April 30, 1998, to sell or deliver at least twenty-six grams but less than

three hundred grams of cocaine. Tennessee Code Annotated section 39-12-103(a) (1997) provides that the

> offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Additionally, "[t]he commission of an overt act in furtherance of the conspiracy is an essential element of the offense." State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999).

Furthermore, the appellant was convicted on count two of possession of at least twenty-six grams but less than 300 grams of cocaine with the intent to sell or deliver. Finally, the appellant was convicted on count three of the sale and delivery of .5 grams or more of cocaine. It is a crime to knowingly sell or deliver a controlled substance or to knowingly possess a controlled substance with the intent to sell or deliver. See Tenn. Code Ann. §§ 39-17-417(a)(2),(3), and (4). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. §39-11-302(b) (1997).

Tennessee law provides that possession of a drug can be either actual or constructive. See State v. Transou, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996). As this court explained in State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citations omitted):

> Before a person can be found to constructively possess a drug, it must appear that the person has "the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others." In other words, "constructive possession is the ability to reduce an object to actual possession." The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.

Long testified that she contacted the appellant on three separate occasions between March 30, 1998, and April 30, 1998, in order to obtain cocaine. On two of these occasions, the appellant directed Long to go to Thompson's apartment to obtain the cocaine. The first time Long went to Thompson's apartment, she obtained cocaine from either Thompson or Williams. Long stated that she did not have to ask Thompson or Williams for cocaine because "[t]hey knew what I was coming for."

Late in the evening of April 29, 1998, Long telephoned the appellant to obtain two ounces of cocaine. Robbins witnessed Long dial a specific telephone number in order to reach the appellant. Robbins also testified that there are twenty-eight grams in an ounce. The appellant again

directed Long to go to Thompson's apartment. After enlisting the aid of the 2nd DTF, Robbins took Long to Sullivan County where they met with Director Bishop. Director Bishop drove Long to Thompson's apartment. When Long entered the apartment, either Thompson or Williams gave Long the cocaine. Both Thompson and Williams were in the apartment at that time. Again, Long did not have to ask for cocaine prior to Thompson or Williams giving her the cocaine. Neither Thompson nor Williams asked Long for payment at that time.

Later on April 30, 1998, Long again dialed the telephone number she had previously used to contact the appellant. She arranged for the appellant to meet her in the Revco parking lot to obtain payment for the cocaine. Shortly thereafter, the appellant arrived at the parking lot. Long entered the appellant's car and, at the appellant's direction, placed $3,300 in the glove compartment of his vehicle. The authorities arrested Long and the appellant.

Subsequently, the authorities executed a search warrant on Thompson's apartment. Therein, the officers discovered at least 467.8 grams of cocaine and crack cocaine. The contraband was located in both of the bedroom closets in the apartment. Fifty small bags of the cocaine were packaged for resale.

We conclude that the evidence adduced at trial was sufficient to establish the appellant's guilt of each of the offenses. On April 29, 1998, the appellant directed Long to Thompson's apartment to obtain two ounces of cocaine and the next day met with Long and accepted the prearranged payment of $3,300, constituting a sale and delivery of more than .5 grams of cocaine.

Additionally, the appellant's actions in directing Long to Thompson's apartment to obtain cocaine and Long's acquisition of the cocaine from Thompson or Williams at the apartment, clearly establish that the appellant constructively possessed the cocaine in the apartment by exercising "dominion or control" over the cocaine through Thompson or Williams. Furthermore, "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419 (1997). Although the appellant was convicted of possessing between twenty-six and 300 grams of cocaine, the proof at trial revealed that there were over 400 grams of cocaine in Thompson's apartment. Robbins opined that anyone buying at least one ounce of cocaine at a time was purchasing for resale. Furthermore, part of the cocaine found in Thompson's apartment was individually packaged for resale. Moreover, Director Bishop asserted that there was no paraphernalia in Thompson's apartment indicating that the cocaine was for personal use. Accordingly, we conclude that there is sufficient evidence in the record supporting the appellant's conviction for possession of cocaine with the intent to sell or deliver. See State v. Joseph Leroy Sullivan, No. 02C01-9803-CC-00071, 1999 WL 134981, at *3 (Tenn. Crim. App. at Jackson, Mar. 15, 1999); Tillery, No. 01C01-9506-CC-00182, 1998 WL 148326, at *1.

Finally, regarding the appellant's conspiracy conviction, we conclude that there is ample evidence that the appellant "orchestrated" the sale and delivery of the cocaine to Long. See

Thornton, 10 S.W.3d at 234. Long went to Thompson's apartment at the appellant's direction to obtain the cocaine and the cocaine was ready for her when she arrived. Our supreme court has noted that "[w]hile the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, the agreement need not be formal or expressed, and it may be proven by circumstantial evidence." State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998) (citations omitted). In the instant case, the jury could have reasonably inferred the existence of an agreement between the appellant, Thompson, and Williams to sell and deliver the cocaine. See, e.g., State v. Yasmond Fenderson, No. 03C01-9711-CR-00496, 1999 WL 2840, at *4 (Tenn. Crim. App. at Knoxville, Jan. 6, 1999) (finding that although the State presented no direct proof of an agreement between conspirators, a jury may reasonably infer the existence of such an agreement from the conspirators' acts).

## F. Sentencing

Appellate review of the length, range or manner of service of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102 and -103 (1997), -210 (2002 Supp.); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. In the instant case, because the record does not affirmatively reflect that the trial court adequately considered sentencing principles and because the trial court did not specify which enhancement factors were applicable to each offense, this court will examine the trial court's determinations without a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

## 1. Length of Sentences

The appellant complains that the trial court erred in imposing sentences of twenty years for each of the appellant's convictions, the maximum sentence possible for a Range II offender convicted of a Class B felony. Specifically, the appellant contends that the trial court gave improper weight to certain enhancement factors and failed to consider an appropriate mitigating factor.

The appellant was convicted of three Class B felonies. See Tenn. Code Ann. § 39-17-417(c)(1) and (i)(5). To begin a sentencing determination, a court should begin at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). The presumptive sentence for a Class B felony is the minimum sentence within the appropriate range. See Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a standard Range II offender, and on appeal, does not challenge this designation. Accordingly, the presumptive sentence for the appellant's Class B felony convictions was twelve years. See Tenn. Code Ann. § 40-35-112(a)(1)-(3) (1997).

The trial court found the existence of the following enhancement factors: (1) the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) the appellant was a leader in the commission of an offense involving two or more criminal actors; (8) the appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and (13) the felonies were committed while the appellant was on parole from a prior felony conviction.

See Tenn. Code Ann. § 40-35-114(1), (2), (8), and (13) (1997).[4] The trial court gave "great weight" to enhancement factors (1), (2), and (13), and gave "moderate weight" to enhancement factor (8).

The appellant does not contend that the trial court erred in finding the existence of enhancement factors (8) or (13). Upon review of the record, we conclude that those enhancement factors do exist and were correctly applied to all three of the appellant's convictions. However, the appellant contends that the trial court erred in giving great weight to enhancement factor (1) and further erred in finding the presence of enhancement factor (2).

Regarding enhancement factor (1), the appellant argues that the appellant had only four prior misdemeanor convictions in addition to the felony convictions used to establish his status as a Range II offender. See Tenn. Code Ann. § 40-35-114(1). The appellant asserts that "while this factor may have been applicable, it was entitled to little weight since these were misdemeanor and not felony offense[s], and such a number of misdemeanor convictions should not be construed as a lengthy criminal history."

Initially, we note that " the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." State v. Boggs, 932 S.W.2d 467, 475-476 (Tenn. Crim. App. 1996). Moreover, the proof adduced at the sentencing hearing revealed that not only did the appellant have four prior criminal convictions in addition to those convictions used to establish the appellant's status as a Range II offender, the appellant had previously admitted to being a "professional drug dealer."

Specifically, Bill Edwards, who had been the appellant's probation officer on a prior occasion, testified that when Edwards compiled a presentence report for the appellant in 1995, the appellant told Edwards "that the only reason he ever worked was as a cover to – for his drug s[ales]; that he essentially was a professional drug dealer." Edwards further testified that the appellant

_____

[4] As of July 4, 2002, the statutory enhancement factors have been renumbered. See Tenn. Code Ann. § 40-35-114 (Supp. 2002). However, in the instant case, we will use the numbering of the 1997 version of Tennessee Code Annotated section 40-35-114.

-18-

was very open about it that for a four year period that he had started out in the drug business working as what he called a runner, which was someone who delivered drugs to the buyer and brought the money from the buyer back to the dealer, and that he, in fact, had through self promotion . . . grown into where he was, in fact, the dealer and had at least two runners at any given time working for him.

Additionally, the presentence report for the instant offenses reflects that the appellant admitted that he began drinking excessively when he was in high school and that he "began using marijuana at age 15 and that he used marijuana 'heavily' for 'several years' at the rate of '2 or 3 joints a day.' He reported that he began using cocaine in 1993 'if someone is sharing it.'" We conclude that this evidence of criminal behavior justifies the application of enhancement factor (1) to all three of the appellant's convictions and is entitled to great weight.

Regarding enhancement factor (2) the appellant "first assert[s] that this factor was not applicable to the conspiracy conviction since it is an essential element of that offense because two (2) or more criminal actors are necessary for commission of that offense." See Tenn. Code Ann. § 40-35-114(2). The appellant also argues that the proof does not support the finding that he was a leader in the commission of the possession and sale offenses.

Initially, we note that the appellant is correct in asserting that a court may not enhance a sentence if the enhancement factor is an essential element of the offense. See Tenn. Code Ann. § 40-35-114. However, being a leader in the commission of an offense involving two or more criminal actors is not an element of the offense of conspiracy. Conspiracy involves an agreement between two or more persons to engage in a criminal act; conspiracy does not require that the State prove leadership in the criminal act. Notably, this court has previously upheld the application of enhancement factor (2) to conspiracy convictions. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995); State v. Little, 854 S.W.2d 643, 652 (Tenn. Crim. App. 1992).

Moreover, we note that the proof adduced at trial amply established the appellant's role as a leader in each of these offenses. As the trial court observed, "He didn't allow anybody else to get the money. . . . [T]he other two people, they weren't paid the money when the cocaine was picked up. They merely handed it over. . . . He's the one that made the arrangements. He's the one that got the money."

"Our cases have established that enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). We conclude that the trial court properly applied this enhancement factor to each of the appellant's convictions and did not err in assigning this factor great weight. See State v. Holston, 94 S.W.3d 507, 512 (Tenn. Crim. App. 2002); State v. Blackmon, 78 S.W.3d 322, 337 (Tenn. Crim. App. 2001).

The appellant next contends that the trial court should have considered as a mitigating factor that the appellant assisted federal authorities in prosecution of other criminal defendants. The

appellant argues that the trial court should have mitigated the sentence based upon mitigating factor (9) or (13). Tennessee Code Annotated section 40-35-113(9) (1997) states that a sentence may be mitigated if "[t]he defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses." Mitigating factor (13) states that a trial court may mitigate a sentence based upon "[a]ny other factor consistent with the purposes of this chapter." Id. at (13).

At the sentencing hearing, the following colloquy occurred between defense counsel and Director Bishop:

> Defense Counsel: You were active or were involved in the prosecution in Federal Court as well as this prosecution. Is that correct?
>
> Director Bishop: Yes, sir.
>
> Defense Counsel: All right, and in the course of, of the federal prosecution, [the appellant] agreed to provide assistance to you and to the federal government in regard to prosecution of other people, didn't he.
>
> Director Bishop: Yes, sir, to the federal government. Yes, sir.
>
> Defense Counsel: And in fact as a result of that, various other people were indicted down in Federal Court and wound up pleading guilty in Federal Court, didn't they?
>
> Director Bishop: I don't believe his information [led] to that but he did provide information about those individuals.
> . . . .
> Defense Counsel: Okay, and as a result of, and you may not know this, but as a result of his cooperation, he obtained what was called a Downward Departure in Federal Court, got less of a sentence?
>
> Director Bishop: I know that to be true, yes.

The trial court refused to apply mitigating factor (9) because the appellant assisted the federal authorities in prosecuting individuals, but the appellant did not assist state authorities in the prosecution of state cases. We can find nothing in the language of mitigating factor (9) that so limits the application of this mitigating factor. However, we conclude that because the appellant did not help authorities until after his arrests, this enhancement factor is entitled to little weight in its application to all of the appellant's convictions. Cf. State v. William Douglas Zukowski, No. M2001-02184-CCA-R3-CD, 2003 WL 213785, at *19 (Tenn. Crim. App. at Nashville, Jan. 31,

2003) perm. to appeal denied, (Tenn. 2003). Accordingly, we conclude that the trial court did not err in sentencing the appellant to the maximum sentence within the range for each offense.

## 2. Consecutive Sentencing

The appellant complains that the trial court erred by ordering that the sentence on count three be served consecutively to his sentence for count one. Initially, we note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

Tennessee Code Annotated section 40-35-115(b) (1997) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court imposed consecutive sentencing because the appellant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood and he is an offender whose record of criminal activity is extensive.

The professional criminal classification derived from Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. Gray defined a professional criminal as "one who has knowingly devoted himself to criminal acts as a major source of livelihood or who has substantial income or resources not shown to be derived from a source other than criminal activity." Id. The appellant's presentence report reflects the appellant's last reported job was at Fuddrucker's Restaurant in Kingsport, which employment ended in 1994. The report states that "according to previous TDOC records, the defendant has worked at Wendy's, Fuddrucker's, Holiday Inn, Shoney's, McDonald's, and Pizza Hut in Kingsport, TN. He stated that the only reason he 'ever worked was a cover job for cocaine sales.' The defendant was not available for update of this information." Furthermore, Edwards testified at the sentencing hearing that during the compilation of the appellant's 1995 presentence report, the appellant related that over the course of four years, he went from being a "runner" for drugs into a "dealer" with "runners" working for the appellant. The discovery of a large amount of cocaine at Thompson's apartment, some of which was packaged for resale, indicates that the appellant was a dealer at the time of the instant offenses. Thus, we determine that the trial court did not err in finding that the State had proven by a preponderance of the evidence that the appellant was a professional criminal. See State v. Adrian S. Lennox, No. M2000-02869-CCA-R3-CD, 2001 WL 1077964, at *5 (Tenn. Crim. App. at Nashville, Sept. 14, 2001).

Additionally, the presentence report reflects that the twenty-nine-year-old appellant has two prior convictions for the sale of cocaine, a conviction for aggravated assault, two convictions for marijuana possession, a conviction for driving while his license was suspended, and a conviction for possession of alcohol by a person under the age of twenty-one. Moreover, the appellant admittedly has an extensive past in the drug trade. Therefore, we conclude that the trial court did not err in finding that the appellant has an extensive record of criminal activity. The trial court permissibly imposed consecutive sentencing.

## 3. Fines

Finally, the appellant contends that the trial court's imposition of fines totaling $150,000 is excessive. Both the state and federal constitutions prohibit the imposition of "excessive" fines. See U.S. Const. Amend. VIII; Tenn. Const. Art. I, § 16; State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002). A defendant convicted of the sale of .5 grams or more of cocaine may be fined not more than $100,000. See Tenn. Code Ann. § 39-17-417(c)(1). Additionally, a defendant convicted of the possession of more than twenty-six grams but less than 300 grams of cocaine with the intent to sell or deliver or a defendant convicted of the conspiracy to sell or deliver the same amount of cocaine may be fined not more than $200,000. Id. at (i)(5). However, our supreme court has indicated that a fine may be considered excessive even though it does not exceed the statutory maximum. Taylor, 70 S.W.3d at 721.

In the instant case, the jury imposed a fine of $30,000 for the appellant's sale conviction and fines of $60,000 each for the possession and conspiracy convictions for a total amount of $150,000, well within the maximum fine permissible by statute. The trial court ratified these fines in sentencing the appellant. Our supreme court has noted that "[t]he trial court's imposition of a fine, within the limits set by the jury, is to be based upon the factors provided by the 1989 Sentencing Act, which include 'the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence.'" Id. at 723 (quoting State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993)). Thus, although the defendant's ability to pay a fine is a factor, it is not necessarily a controlling one. Regardless, we recognize that an oppressive fine can disrupt future rehabilitation and prevent a defendant from becoming a productive member of society. See Marshall, 870 S.W.2d at 542.

The record reflects that the appellant is indigent and will be incarcerated for forty years. Therefore, "a large punitive fine does not appear necessary to achieve the appropriate overall sentence." Taylor, 70 S.W.3d at 723. Accordingly, we conclude that the fines imposed are excessive. We reduce the amount of the appellant's fines to $10,000 for the sale conviction and $20,000 each for his remaining two convictions.

### III.  Conclusion

Based upon the foregoing, we affirm the judgments of the trial court, but remand for a reduction of the appellant's fines as directed in this opinion.

_____
NORMA McGEE OGLE, JUDGE

-22-